[Cite as *Daddario v. Rose*, 2024-Ohio-5882.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| COLLEEN O. DADDARIO, et al. | JUDGES:<br>Hon. John W. Wise, J. |
|     Plaintiffs-Appellees | Hon. W. Scott Gwin, P. J.<br>Hon. Andrew J. King, J. |
| -vs- | |
| | Case No. 2024 CA 00032 |
| MARYBETH O'HEARN ROSE | |
|     Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDING:    Civil Appeal from the Court of Common Pleas, Probate Division, Case No. 237211

JUDGMENT:    Affirmed

DATE OF JUDGMENT ENTRY:    December 16, 2024

APPEARANCES:

For Plaintiffs-Appellees

WILLIAM J. STAVOLE
H. WILLIAM BESETH III
TUCKER ELLIS LLP
950 Main Street, Suie 1100
Cleveland, Ohio 44113

BRIAN C. LAYMAN
LAYMAN LAW GROUP, LLC
4881 Munson Street, NW, Suite 301
Canton, Ohio 44718

DAVID DINGWELL
200 Market Avenue North, Suite 300
Canton, Ohio 44702

For Defendant-Appellant

LAURA L. MILLS
PIERCE C. WALKER
MILLS, MILLS, FIELY
& LUCAS, LLC
101 Central Plaza South, Suite 1200
Canton, Ohio 44702

*Wise, J.*

**{¶1}** Appellant, Marybeth Rose O'Hearn, appeals the December 19, 2022 amended judgment entry of the Stark County Court of Common Pleas, Probate Division.

**FACTS AND PROCEDURAL BACKGROUND**

*The O'Hearn Trusts*

**{¶2}** Kathleen and Arthur O'Hearn lived in Stark County, Ohio and had four children, Colleen, Timothy, Jeffrey and Marybeth. During their lives, they worked hard, were successful in many businesses and owned A-1 Realty. They built and owned commercial apartment buildings on the corner of Whipple and Munson in Canton, Ohio known as the Whipple Avenue property. (Tr. I, 15). Their assets totaled over two million dollars. (Tr. II, 237.)[1]

**{¶3}** Kathleen O'Hearn and Arthur O'Hearn each executed a trust on December 4, 1991. Their four children, Colleen, Timothy, Jeffrey and Marybeth were named as remainder beneficiaries. Arthur died on February 25, 2011 and his wife, Kathleen, became the successor trustee of his trust. Kathleen was also the trustee of her own trust.

**{¶4}** The four siblings were treated as equal beneficiaries by both Arthur and Kathleen's trusts with one exception. Arthur, prior to his death, executed an amendment to his trust that provided that if Kathleen predeceased Arthur, then upon Arthur's death, the Edward Jones account would be distributed only to Marybeth.

---

[1] The videoconference trial held on July 15, 2021 will be referred to as Tr. I and II _____

**{¶5}** Kathleen's daughter, Marybeth, was the only child still living in Stark County. Timothy lived near Cleveland, Jeffrey lived in Cincinnati and Colleen lived in Chagrin Falls.[2]

**{¶6}** On December 21, 2011, Kathleen amended her trust and appointed her daughter, Marybeth as co-trustee of her trust and to serve as executrix of her estate. Kathleen maintained the distribution of the trust remainder as equal to her four children but added for her grandchildren to be provided for from the trust as each of her four children deemed appropriate. "It is my desire that the named beneficiaries Jeffrey A. O'Hearn, Timothy J. O'Hearn, Marybeth O'Hearn Rose, and Colleen A. Daddario provide from their respective shares for distributions to my grandchildren, in such amounts as they deem appropriate."

**{¶7}** In short, both Arthur and Kathleen expressed their intention in their trusts that all four of their children share equally in the wealth they had accumulated upon their passing with exceptions as noted above for the grandchildren and Edward Jones account to Marybeth.

*Shelter Plan*

**{¶8}** After Arthur's death, Kathleen was diagnosed with Parkinson's disease. As a result, there was some talk of her admission to a skilled nursing or assisted living facility. Two doctors suggested that she plan on residing in a nursing home. Kathleen signed a contract with one, the Alsatian in Louisville, Ohio. But Kathleen had second thoughts.

---

[2] Jeffrey O'Hearn died during litigation in this matter and his estate was substituted as a plaintiff.

{¶9} Kathleen wished to remain in her home, and her daughter Marybeth moved in with her for a time and became her primary caretaker from 2013 until her death on April 9, 2018. Caretakers were hired to assist with Kathleen's care, drive her to doctor's appointments, do her housekeeping, keep her company and ensure that she ate, as she was becoming increasingly depressed after her husband's death and her Parkinson's diagnosis became worse.

{¶10} Kathleen sought the advice of Margaret Kreiner, an attorney who held herself out as an elder law and estate planning attorney. An appointment was made for Kathleen to consult with Attorney Kreiner.

{¶11} Kathleen arrived at the office consultation with Marybeth and Todd Bosley, Marybeth's business partner. Attorney Kreiner had Kathleen fill out an intake sheet prior to any conversation:

> [KREINER]]: So normally when they come I have an intake sheet, and one of the questions I ask them are what are your goals. And she [Kathleen] came in and said to protect my assets and avoid probate. Tr. I, 190.

{¶12} Marybeth and Todd Bosley sat in on the office conference with Attorney Kreiner and Kathleen.

{¶13} Attorney Kreiner made a list of all of Kathleen's assets and noted that they were substantial – almost 1.8 million - and that didn't include the assets in her late husband's trust. Tr. 1, 191.

{¶14} Attorney Kreiner devised a plan to shelter Kathleen's funds in the event she entered a nursing home facility. The plan was detailed in a letter Attorney Kreiner sent to

Kathleen dated April 18, 2012. Bosley and Marybeth were sent a copy. The plan included the transfer of Kathleen's assets into the name of Marybeth for the purpose of protecting her assets and avoiding probate. The plan also included an update of a durable power of attorney. Attorney Kreiner drafted a power of attorney and Kathleen signed it naming Marybeth as her agent.

{¶15} Attorney Kreiner also drafted a Limited Warranty Deed which Kathleen signed transferring the Barnhill residence to Marybeth. A transfer on death affidavit was then prepared for Marybeth to sign naming Colleen as the sole transfer on death beneficiary. Tr. I, 183. The documents were signed by Kathleen and Marybeth and recorded with the Stark County Recorder. An oil and gas lease transfer was also prepared transferring Kathleen's interests to Marybeth.

{¶16} Attorney Kreiner prepared no other documents transferring assets from Kathleen to Marybeth. Kathleen never asked Attorney Kreiner to change her trust. Tr. I, 182.

{¶17} Attorney Kreiner had no knowledge of the transfers of any other assets from Kathleen, Kathleen's trust or Arthur's trust to Marybeth until April of 2021. Tr. I, 184.

{¶18} Attorney Kreiner saw Kathleen approximately four or five times. During those meetings, she didn't believe she advised her to file gift tax returns on any gifts to Marybeth because she didn't know she was "doing gifting." Tr. I, 211. Attorney Kreiner prepared no gift tax return for the Barnhill property transferred to Marybeth. Tr. I, 185.

{¶19} Following the death of Kathleen, Attorney Kreiner represented Marybeth in certain probate court proceedings involving the administration of Kathleen's estate. Tr. I, 229.

*Assets transferred to Marybeth's name.*

{¶20} Following the letter from Attorney Kreiner, certain assets belonging to Kathleen were transferred to Marybeth's name, including the following transfers.

1. PNC Bank account with funds in the amount of $54,068.65 held jointly by Kathleen and Marybeth to solely in Marybeth's name.

2. Huntington Bank accounts with funds in the amount of $275,157.74 from Kathleen's trust to solely in Marybeth's name. Colleen was listed as the transfer on death beneficiary until 2018 when Marybeth changed the beneficiaries to her two daughters.

3. American Century Investments account with funds in the amount of $25,151.72 from Arthur's trust to solely into Marybeth's name.

4. Real estate known as the Barnhill Property transferred by limited warranty deed from Kathleen to Marybeth. Kathleen's daughter, Colleen, was listed as the transfer on death beneficiary. Following the death of Kathleen, Marybeth sold the residence and retained the proceeds.

5. Whipple Road funds owned jointly in Arthur and Kathleen's trust for a mortgage payoff in the amount of $333,952.00 transferred directly to an account solely in Marybeth's name. This property had been sold to Property Alliance Group (PAG), a real estate entity owned by Marybeth and Todd Bosley prior to Kathleen's death.

6. Edward Jones account with funds in the amount of $141,782.05 transferred by Kathleen to Marybeth.

7. Mineral rights interest from Arthur's Trust to Kathleen's Trust; then transferred from Kathleen's Trust to Marybeth.

**{¶21}** The transfers took place over several months from 2012 to 2015 and were in an amount in excess of one million dollars. Several documents and notes confirm that Kathleen's intent was to implement a shelter plan and maintain ownership and control of the assets for her benefit and needs even after the transfers occurred. The exception was the Edward Jones account which she wrote was intended for Marybeth and the PNC account that Kathleen intended to gift to Marybeth for help she had given her.

*August, 2013 Email from Marybeth to her siblings*

**{¶22}** When a question was raised by one of Kathleen's siblings regarding Kathleen's assets, Marybeth wrote the following email to all of her siblings, Colleen, Jeffrey and Timothy:

Margaret Kreiner is a respected attorney who specializes in Elder Law and Estate Planning. My objective was to preserve as much of her estate as possible so that she could have the resources to live where she wanted, (home) as long as it was safe, and perhaps have assets left over for her to do what she desired (hair appointments, massages, gifts to grandkids, etc.) and $ to will to children/grandchildren/Parkinsons Research, whatever.

Kreiner advised a plan that moved Mom's assets out of her name in order to prevent the government/care agency/facility from taking all the assets that belong to mom. Most of the money and the house have been transferred out of Mom's name and into my name. It has been a loooong,

slow emotional process, as end of life issues are very, very hard for mom to discuss.

Moving assets, for example, allows mom to access VA benefits to help offset the expense of in-home care should the need arise. Every single penny is accounted for and in the proper accounts to pass the scrutiny of the State and anyone else.

Mom's CPA is Tim Barta, of Smith, Barta and Co. on Hills and Dales Rd. He has also been overseeing things to make sure they are done properly. If I kick off before mom, all of mom's assets have been made POD to you 3, plus my estate, for my girls. Of course, that money is only to be used for care of mom and no other purpose until she passes, any remaining bills paid, then the balance divided among whomever/whatever she wishes.

The way it is set up, none of us should have to pay any money for her to receive quality care, so don't worry about that.

**{¶23}** (Pl.'s Trial Exh. 37)

**{¶24}** Following that detailed e-mail to Marybeth's siblings, Jeffrey O'Hearn wrote the following:

It seems to me that two questions are being asked.

At mom's death:

Will the proceeds from Whipple Road be included in mom's estate/will?

Will the proceeds from the sale of mom's house be included in mom's will and equitably distributed upon sale among the four of us?

Love,

Jeff

Marybeth replied:

Yes and yes

Love,

Marybeth

**{¶25}** (Pl.'s Trial Exh. 37).

*Kathleen's death on April 9, 2018*

**{¶26}** Kathleen died on April 9, 2018 survived by her four adult children and grandchildren. Marybeth sold the Barnhill property that her mother lived in and retained the assets. In June, 2018, two months after Kathleen died, Marybeth told her siblings, for the first time, that she intended to keep all of the moneys transferred into her name. When asked why she did not tell her siblings sooner that they would receive no moneys from the trust moneys transferred to her name, she explained that it wasn't her business to tell them. "Mom said she was going to tell them." Tr. I, 163. When the siblings were cleaning out the Barnhill residence, Marybeth informed her siblings that the assets belonging to Kathleen were her sole property; that their mother, Kathleen, had transferred the bulk of her assets to her [Marybeth] as a gift.

[COLLEEN DADDARIO]: Saturday evening, it was just Jeff and Beth and I left at Mom's house, and we ordered a pizza. And I don't remember exact words, but basically, Jeff must have said something about, you know, 'So what's happening with the house?' And that's when Marybeth told us that she was keep—that the house was hers, she was keeping the

house, and everything else that had been transferred she was keeping, and that she still hadn't submitted a bill to the estate for more money that she felt she was owed for expenses . . .

And he [Jeff] said, 'is it six figures?' And she said 'Yes.'

**{¶27}** Tr. I, 69.

**{¶28}** Colleen and Jeffrey were dumbfounded.

*Court gets involved*

**{¶29}** Various lawsuits ensued. On June 16, 2020, siblings Colleen, Timothy and Jeffrey filed a complaint against Marybeth claiming fifteen separate counts including constructive trust, unjust enrichment, conversion, accounting, breach of fiduciary duty, fraud and removal of Trustee.

**{¶30}** Marybeth was removed as a trustee and fiduciary and David Dingwell, was appointed successor fiduciary. He filed a suit against Marybeth claiming breach of fiduciary duty, concealment of assets, accounting, and declaratory judgment.

**{¶31}** The lawsuits were consolidated by the probate court.

*Bench trial held July 15, 2021*

**{¶32}** Following discovery and various pre-trial motions and summary judgments, a bench trial was held on July 15, 2021. Marybeth testified that her e-mail to her siblings was a lie and that Kathleen had transferred the bulk of her assets to her as a gift. When asked why she didn't tell her siblings that her intention was to treat the transferred assets as a "gift" to her, she explained:

[MILLS]: And I don't know where it is, but somewhere in this particular email you talk about all of her assets have been transferred?

[MARYBETH]: Yeah.

[MILLS]: That wasn't true?

[MARYBETH]: No, it wasn't.

[MILLS]: Why did you tell them something that wasn't true?

[MARYBETH]: I don't know. I wanted them to just stop asking me questions.

**{¶33}** Tr. II, 283.

*Trial Court issued Judgment Entry on September 23, 2021.*

**{¶34}** The trial court issued a judgment entry on September 23, 2021.

**{¶35}** The trial court found that five of the several transfers were not inter vivos gifts totaling $867,813.07. The trial court further found that the PNC and Edward Jones account transfers were valid gifts to Marybeth.

**{¶36}** The trial court also found in favor of Marybeth's siblings on their fraud and conversion claims, granted the request of Attorney Dingwell for declaratory judgment to return the assets to the trusts, and denied the request for a constructive trust. The trial court found in favor of Marybeth on the concealment claim. The court granted the appellees' motions for prejudgment interest and attorneys' fees. The court awarded $126,131.28 in pre-judgment interest to Attorney Dingwell.

**{¶37}** The moneys were placed in escrow pending appeal, and the issues of attorneys' fees and punitive damages were stayed.

*Appellate Court ruling – Daddario I*

**{¶38}** The appellant, Marybeth, filed an appeal with this court alleging four assignments of error. *Daddario v. Rose,* 2022-Ohio-3537 (5th Dist.). This Court denied

assignment of error number one, found assignments of error numbers three and four premature and sustained appellant's second assignment of error.

**{¶39}** This Court found that in determining the conveyance of inter vivos gifts, the trial court applied the wrong standard "clear and convincing evidence" instead of "preponderance of the evidence."

> In its judgment entry, the trial court examined each contested gift and determined whether appellant met her burden of proving an inter vivos gift by clear and convincing evidence. The trial court did not discuss the family gift presumption nor the undue influence presumption. Because appellant and her mother shared a fiduciary relationship, a presumption of undue influence arose as to all of the assets appellant alleges were conveyed as gifts, and appellant was required to rebut this presumption by a preponderance of the evidence.

**{¶40}**    *Id.* at ¶ 30

> . . . [T]he matter is remanded for a determination of whether appellant presented sufficient evidence to rebut the presumption of undue influence by a preponderance of the evidence and, if so determined, whether appellees presented clear and convincing evidence to rebut the family gift presumption.

**{¶41}**  *Id.* at ¶ 36.

*Remand to the Trial Court*

**{¶42}** On December 19, 2022, the trial court [Hon. Dixie Park] issued an Amended Judgment Entry pursuant to this Court's remand. The Entry consisted of twenty-three pages and contained findings of fact and conclusions of law.

**{¶43}** The trial court first determined that the "evidence and testimony presented at the hearing demonstrated each element of undue influence by a preponderance of the evidence. ...Therefore, Marybeth has failed to present evidence sufficient to rebut the presumption of undue influence by a preponderance of the evidence." *Judgment Entry, Dec. 19, 2022* at 9.

**{¶44}** Next, the trial court considered the family gift presumption. "However, assuming *arguendo* that Marybeth met her burden of rebutting a presumption of undue influence by a preponderance of the evidence, the burden would shift to Plaintiffs to rebut the family gift presumption by clear and convincing evidence." *Judgment Entry, Dec. 19, 2022* at 10. The trial court did an analysis of each of the transfers based on the testimony and exhibits produced at trial. The trial court found that evidence was sufficient to rebut the family gift presumption by clear and convincing evidence for five of the seven transfers of assets. With regard to the PNC account, it found that one-half belonged in Kathleen's Estate because Marybeth failed to rebut the presumption of undue influence.

**{¶45}** The trial court further found that the main source of evidence that Kathleen made an inter vivos gift of her assets to Marybeth was Marybeth's testimony. The trial court found that Marybeth's testimony was "wholly unreliable and unconvincing." "In conclusion, the Court has previously determined and continues to find that the transferred assets to Marybeth were not gifts." *Judgment Entry, Dec. 19, 2022* at 11. .

**{¶46}** The trial court further found that Marybeth committed fraud when she misled her siblings in the August, 2013 email. "Finally, the Court finds that a resulting injury of being deprived of a rightful inheritance was proximately caused by the reliance... [T]he Court hereby enters judgment in favor of Plaintiff's on Counts VI and XIII." *Judgment Entry, Dec. 19, 2022* at 18.

**{¶47}** The trial court further entered judgment for plaintiffs on conversion and breach of fiduciary duty. [3]

**{¶48}** As to the concealment claim, the trial court found in appellant's favor.

**{¶49}** As to appellees' request for a constructive trust, the trial court found that a constructive trust was not necessary as the trusts and Kathleen's Estate have the capacity to receive and distribute any misappropriated funds ordered herein.

*Hearing on August 25, 2023 on attorneys' fees,*
*punitive damages and prejudgment interest.*

**{¶50}** Following the issuance of the December, 2022 Amended Judgment Entry, the trial judge recused herself and a new visiting judge was assigned to preside over the case.

**{¶51}** The matter of attorneys' fees, prejudgment interest and punitive damages came on for hearing on August 25, 2023.

*Hearing on attorneys' fees*

**{¶52}** At a pretrial immediately preceding the hearing, appellant objected to the testimony of Attorney Charles Brown as an expert witness to testify on behalf of appellees

---

[3] A second appeal was filed by appellant in 2023 that was dismissed for lack of jurisdiction, 2023 CA 00012.

on attorneys' fees. In accordance with an agreed judgment entry, appellant received the name of Attorney Brown three days prior to the hearing, Tr. August 25, 2023 at 6.

**{¶53}** Appellant alleged that Attorney Brown was an expert witness, and she did not receive a copy of his expert report and curriculum vitae in accordance with App.R. 27. The trial court overruled the objection of appellant saying:

> . . . if he's not testifying as an expert and he's just testifying as to his lay opinion, we'll – we'll see what he has to say...[A]nd he's not going to be qualified as an expert, we'll just hear what he has to say. Okay. And then so I'm overruling the motion to exclude this person as a lay witness.

**{¶54}** Tr. August 25, 2023 at 12.

**{¶55}** The appellees-siblings then presented the testimony of two attorneys who represented appellees, the testimony of Attorney Brown and the itemized invoices. Appellant cross-examined all of the witnesses and presented no additional evidence.

*Punitive Damages*

**{¶56}** At the portion of the hearing on punitive damages, no testimony was presented as to award of punitive damages. The parties stipulated as to the evidence to be considered for punitive damages, to wit, the trial transcripts, no previous deposition testimony not used at trial for impeachment, oral arguments, briefs and exhibits.

**{¶57}** The parties submitted written arguments to the trial court.

**{¶58}** In separate entries, the visiting judge awarded prejudgment interest to Attorney Dingwell in the amount of $135,264.89, denied punitive damages to appellee siblings, and awarded attorneys' fees to appellees-siblings in the amount of $307,250.00. *Judgment Entries, Nov. 3, 2023, Jan. 8, 2024, Feb. 26, 2024.*

**{¶59}** Appellant Marybeth filed a timely appeal to this Court assigning three assignments of error.[4]

## ASSIGNMENTS OF ERROR

**{¶60}** "I.    THE TRIAL COURT ERRED IN ITS DECEMBER 19, 2022 AMENDED JUDGMENT ENTRY UPON REMAND IN ITS APPLICATION OF THE FAMILY GIFT PRESUMPTION.

**{¶61}** "II.    THE TRIAL COURT ERRED WHEN IT FAILED TO PROVIDE ANY EXPLANATION OR ITS REASON OR REASONS FOR RULING ON THE APPELLEE'S MOTION FOR ATTORNEY FEES.

**{¶62}** "III.    THE TRIAL COURT ERRED IN ITS JANUARY 8, 2024 ORDER WHEREIN IT PERMITTED EXPERT TESTIMONY REGARDING ATTORNEY FEES WITHOUT AN EXPERT REPORT, CURRICULUM VITAE, OR TIMELY NOTICE OF AN EXPERT."

## LAW AND ANALYSIS

### *I. Manifest Weight of the Evidence*

**{¶63}** In her first assignment of error, appellant contends the trial court erred when it found that Kathleen did not intend to relinquish ownership of the majority of her wealth to Marybeth as inter vivos  gifts.  We review this assignment under a manifest weight of the evidence standard.

---

[4] Not at issue in this appeal is the prejudgment interest awarded to Attorney Dingwell by Judgment Entry of Feb. 26, 2024 which has not been assigned as error or the judgment of the Probate Court that the Estate of Kathleen O'Hearn is entitled to one-half of the PNC account as no stay of judgment was filed by appellant and the judgment has been satisfied.

**{¶64}** Under a manifest weight of the evidence standard, this Court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether the trial court clearly lost its way and created a manifest miscarriage of justice.

**{¶65}** This Court applied the manifest weight of the evidence standard to a probate court concealment action in *Estate of DeChellis v. DeChellis,* 2019-Ohio-3078 (5th Dist.) and adopted the standard set forth by the Ohio Supreme Court in *Eastley v. Volkman,* 2012-Ohio-2179.

**{¶66}** The Ohio Supreme Court held the standard of review for manifest weight of the evidence for criminal cases stated in *State v. Thompkins,* 75 Ohio St.380 (1997) is also applicable in civil cases:

A reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine 'whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'

**{¶67}** *Id.* at ¶ 49.

**{¶68}** The *DeChellis* court emphasized that we are not fact finders; "we neither weigh the evidence nor judge the credibility of witnesses."  *Id.* at ¶ 50 citing *Markel v. Wright,* 2013-Ohio-5274 (5th Dist.).

Further, "an appellate court should not substitute its judgment for that of the trial court when there exists...competent and credible evidence

supporting the findings of fact and conclusions of law. *Id.* at ¶ 50 citing *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d77, 80 (1984).

The underlying rationale for giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony.

**{¶69}** *Id.* at ¶ 50. *Accord, Donaldson v. Donaldson,* 2024-Ohio-4597, ¶ 79-84 (5th Dist.).

**{¶70}** Specifically, appellant claims that in rejecting Marybeth's claims that the various asset transfers were gifts to her, the trial court failed to properly shift the burdens of proof when it considered a family member who was also a fiduciary. In its remand, the trial court was instructed to determine whether appellant presented sufficient evidence to rebut the presumption of undue influence by a preponderance of the evidence and, if so determined, whether appellees presented clear and convincing evidence to rebut the family gift presumption. *Daddario v. Rose,* 2022-Ohio-3537, at ¶ 36 (5th Dist.).

**{¶71}** We find that the trial court correctly applied the standards imposed by this court on remand. We further find that the trial court's findings of fact and conclusions of law are not against the manifest weight of the evidence.

**{¶72}** The following facts are not in dispute. The appellant, Marybeth, is the daughter of Kathleen and Arthur O'Hearn. When Arthur died, Kathleen had assets available to her totaling over 1.8 million dollars. Certain assets totaling almost $900,000 were transferred to Marybeth's name. Marybeth was the co-trustee of Kathleen's trust, the fiduciary of her estate and held a durable power of attorney. Accordingly, Marybeth,

a family member, was also in a fiduciary relationship with Kathleen. In such cases, the family gift presumption that the conveyance was intended as a gift, yield to the more specific presumption of undue influence which arises in a fiduciary relationship.

**{¶73}** The test set forth by this court in *Daddario I* was adopted from *Family Services, Inc. v. Beebe,* 5th Dist. Stark No. 2000CA00176, 2000 WL 1751316:

> Where a confidential or fiduciary relationship exists between a donor and donee, the transfer is looked upon with some suspicion that undue influence may have been brought to bear on the donor by the donee. In such cases, a presumption of undue influence arises and the burden of going forward with evidence shifts to the donee to show his conduct was free of undue influence or fraud, and the donor acted voluntarily and with a full understanding of his act and its consequences . . . The donee may rebut the presumption of undue influence by a preponderance of the evidence. *Family Services, Inc. v. Beebe,* 5th Dist., Stark No. 2000CA00176, 2000 WL 1751316 (Nov. 27, 2000), (internal citations omitted).

**{¶74}** In this case, the trial court found that the evidence and testimony presented at the trial demonstrated each element of undue influence by a preponderance of the evidence.

**{¶75}** In its amended judgment entry, the trial court summarized the elements of undue influence: "[1] a susceptible testator, [2] another's opportunity to exert it, [3] the fact of improper influence exerted or attempted, and [4] the result showing the effect of such influence." *Judgment Entry, Dec. 19, 2022 at 8.*

**{¶76}**   The trial court then found that "the evidence and testimony presented at the trial demonstrated each element of undue influence by a preponderance of the evidence."

(1) Kathleen was a widow diagnosed with Parkinson's Disease and a physician recommended that she be admitted to a skilled nursing facility or assisted living facility, (2) Marybeth was her sole caretaker. She also took her to various estate planning meetings, in which asset sheltering plans were discussed and Marybeth had the opportunity to transfer Kathleen's assets and property into her own name.  (3) Following the meetings and planning, those transfers did occur as detailed herein. (4) As a result, Marybeth took possession of the assets and property under the guise of asset sheltering, then retained possession of them following Kathleen's death. *Judgment Entry, Dec. 22, 2022 at 9.*

**{¶77}** The trial court concluded that Marybeth has failed to present evidence sufficient to rebut the presumption of undue influence by a preponderance of the evidence.

**{¶78}** So, too, the trial court found that Marybeth actions constituted fraud and found for her siblings in their fraud action.

**{¶79}** Appellant failed to demonstrate the absence of any element of undue influence and fraud by a preponderance of the evidence.  The evidence and testimony demonstrated that Kathleen was a susceptible testator due to her failing health with Parkinson's Disease and need for assistance with personal care. The evidence demonstrated that Marybeth moved in with Kathleen to assist her and attended the

sheltering planning conferences with Attorney Kreiner, accompanied by her real estate partner Todd Bosley. Marybeth assisted Kathleen in paying her bills and hiring caretakers for her when she wished to continue living in her home.

{¶80} Appellant points to the testimony of herself, Attorney Kreiner and Todd Bosley who testified that no undue influence was exerted on Kathleen by Marybeth and that Kathleen was of sound mind when she met with Attorney Kreiner to discuss her estate plan. Appellant ignores the second part of her burden of proof  - to show that Kathleen acted voluntarily and with a full understanding of her act and its consequences. The evidence demonstrated that Kathleen intended for her assets to be held by Marybeth in a shelter plan for Kathleen's benefit and then pass to her daughter Colleen if Marybeth died before Kathleen for her continued care and benefit.  The evidence did not demonstrate that Kathleen intended to pass her wealth to Marybeth and exercise no dominion, control or ownership of it during her lifetime.

{¶81}  Take, for example, the treatment by Kathleen of the Whipple Road property sold to Property Alliance Group, an entity owned by Marybeth and her partner, Todd Bosley.  When the property was sold in 2013 and the mortgage paid off in the amount of $333,952.00, Kathleen typed on the payoff check the following:  "the grand finale...how I wish Art was here to see this check...his life[']s work – went into savings acct. with First Merit Bank in Marybeth's name...finally have the money to do anything I want and all I want is for Art to be here with me." *Judgment Entry, Dec. 22, 2024 at 14-15.*

{¶82} So, too, there is no credible evidence that Kathleen intended to leave an inter vivos gift of the home where she lived - the Barnhill residence - to Marybeth.  Instead, the evidence demonstrates that she intended to include the residence in her asset shelter

plan. While Kathleen had Attorney Kreiner transfer the property by Limited Warranty Deed to Marybeth, she had Marybeth sign a transfer on death affidavit to her daughter Colleen. Kathleen paid the bills on the property and, as the trial court found, exerted ownership, dominion and control over the property as she resided there. *Judgment Entry, Dec. 22, 2022 at 14.* Despite this evidence, Marybeth sold the Barnhill residence after her mother's death and claimed the sale proceeds as her own.

{¶83} Appellant points to evidence that Kathleen and Arthur intended to leave Marybeth more because of her health problems and single status. In that regard, Kathleen took separate steps to distinguish the Edward Jones Account containing $141,782.05 from her other assets. Arthur, in his trust, stated that Marybeth should retain the Edward Jones account in the event that his wife died before he did. The parties do not dispute that Kathleen intended for Marybeth to have the proceeds of the Edward Jones Account.

{¶84} The evidence demonstrated that while Kathleen and Arthur did indeed want Marybeth to obtain more of their assets by way of the Edward Jones Account, they did not intend to disinherit their remaining children and grandchildren. Kathleen left her trust intact leaving all of her children as residuary beneficiaries. And Marybeth received over $141,000 of their assets in the Edward Jones Account.

{¶85} The evidence established that Kathleen's intention was to create an asset sheltering plan as suggested by Attorney Kreiner and not perform inter vivos gifting of the majority of her assets to one of her children and disinherit the remaining three.

{¶86} After the trial court decided that Marybeth did not rebut the presumption of undue influence by a preponderance of the evidence, it continued its analysis on whether

appellees presented evidence to rebut the family gift presumption by clear and convincing evidence. "While this Court concluded that Defendant has failed to meet her burden of demonstrating a lack of undue influence by a preponderance of the evidence, the instruction on remand required application of both the presumption of undue influence and the family gift presumption. *Judgment Entry, Dec. 22, 2022 at 9.*

**{¶87}** The trial court then concluded that the family gift presumption was rebutted by clear and convincing evidence. The evidence demonstrated that Kathleen's intention was not to transfer the majority of her assets to one daughter, Marybeth, as inter vivos gifts. Rather, her intention was to shelter her assets, use them for her benefit while she was alive and preserve the remainder for all of her children and her grandchildren.

**{¶88}** The trial court found that the main source of evidence that Kathleen intended inter vivos gifts to Marybeth was Marybeth's testimony. The trial court noted that her testimony was impeached and in direct contradiction to her previous depositions. Even then, her testimony was undermined by the August, 2013 email she sent to her siblings. In that correspondence, she explained in great detail the asset sheltering plan that was being implemented in accordance with Kathleen's wishes. When Marybeth testified at the hearing that her email was not true, the trial court found all of her testimony "wholly unreliable and unconvincing". *Judgment Entry, Dec. 22, 2022 at 11.*

**{¶89}** So, too, as noted by appellees, the testimony of Marybeth is undermined by the written evidence so often lacking in "he said-she said" scenarios. In addition to the August, 2013 email to her siblings explaining Kathleen's asset sheltering plan, there was evidence that during Kathleen's lifetime, Marybeth did not treat the transfers to her as inter vivos gifts. Take, for example, the loan money that was being repaid on the

mortgage on the Whipple Road property.  On the Property Alliance Group checks written by Marybeth in repayment of the mortgage, she referenced the loan money as being repaid to "KO" or "mom". Colleen Daddario was also listed as the transfer on death beneficiary.  In January, 2017, appellant faxed a letter to Attorney Kreiner asking her to prepare a document for Kathleen to sign stating that only "one of their investments" [Edward Jones Account] was to go to Marybeth because of her medical conditions.

{¶90}  As noted by appellees, the remand from this Court did not require the trial court to reach a different conclusion; it only required it to adopt the burden shifting standard espoused by this Court in *Beebe* and *Daddario I.*  The trial court did just that.

{¶91}  It took each of the seven substantive asset transfers performed by Marybeth and applied the evidence and testimony to each one.

{¶92}  As further proof that the trial court took to heart its task to apply the burden of proofs set forth in *Daddario I,*  the trial court modified its finding as to the PNC account in its amended judgment entry and found that half of the proceeds were owned by Kathleen's Estate.  This modification was done when the trial court found that appellant did not rebut her burden to demonstrate lack of undue influence and fraud by a preponderance of the evidence.

{¶93}  We find that the trial court carefully weighed the evidence and applied the proper burdens of proof as required under this court's remand.  The trial court's findings of fact and conclusions of law are supported by the manifest weight of the evidence.

{¶94}  Appellant's first Assignment of Error is overruled.

## *II. Attorneys' fees*

**{¶95}** In the second assignment of error, appellant argues that the trial court erred in awarding appellees-siblings attorneys' fees in the amount of $307,250.00. Appellant claims that while the trial court cited the correct standard, Rule 1.5(a) of the Rules of Professional Conduct, it did not provide an explanation of how the standard applied to the attorneys' fees awarded.

**{¶96}** When considering an award of attorneys' fees, Ohio follows the American Rule under which a prevailing party in a civil action may not generally recover attorney fees. However, attorneys' fees may be awarded when a statute or an enforceable contract provided for an award of attorneys' fees or when the prevailing party demonstrates the losing party acted in bad faith. *Jakubs v. Borally,* 2015-Ohio-2696, ¶ 9 (8th Dist.) citing *Wilborn v. Bank One Corp,* 2009-Ohio-306 ¶ 7.

**{¶97}** In this case, the trial court cited R.C. 5810.04 as authority for awarding attorneys' fee. R.C. 5810.04 provides authority to award costs, expenses and reasonable attorney fees in judicial proceedings involving the administration of a trust.

**{¶98}** We review an award of attorneys' fees under R.C. 5810.04 for an abuse of discretion. *Rex v. Rex,* 2016-Ohio-5788, ¶ 51; *McHenry v. McHenry,* 2017-Ohio-1534, ¶ 56. An abuse of discretion implies a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219 (1983). Indeed, where a trial court does not award attorneys' fees in a trust action, appellate courts have remanded the matter to the trial court to determine if such an award was warranted.

**{¶99}** *Wills v. Kolis,* 2010-Ohio-4351, ¶ 52 (8th Dist.); *Jakubs v. Borally,* 2015-Ohio-2696 (8th Dist.) at ¶ 19 (". . . [W]e reverse the trial court's judgment with respect to

the award of attorney fees, costs, and expert witness fees.  We remand the matter to the trial court with instructions to conduct an evidentiary hearing to determine if such an award is warranted.")

{¶100} Appellant does not dispute the authority of the trial court to award attorneys' fees under R.C. 5810.04 nor does she argue that the amount of fees is disproportionate to the amount of compensatory damages or shocks the conscience.  Her claims are that the trial court did not provide her guidance as to how it reached the amount of $307,250.00.  *Appellant's Brief at 18.*

{¶101} After the presiding judge issued its amended judgment entry finding for appellees, she recused herself and a visiting judge was appointed by assignment to hear the issues of punitive damages, prejudgment interest and attorneys' fees.

{¶102} The record demonstrates that a pre-evidentiary hearing was held with all parties, and the parties agreed on an evidentiary hearing date and to exchange witness lists three days prior to the hearing.

{¶103} On August 25, 2023, the matter of attorneys' fees came on for evidentiary hearing.

{¶104} The attorneys for appellees-siblings testified and presented invoices claiming 1,242.20 billable hours of work from April, 2020 to August, 2023.  Appellant cross examined the attorneys on their fees.

{¶105} On January 8, 2024, the visiting judge entered an order reducing the requested amount from $454,784.75 to $307,250.00.  Before entering the award, the court noted that the Court must "determine whether the fees to be assessed against the

Defendant are reasonable." *Judgment Entry, Jan. 8, 2024, at* 5. It then stated that it was guided by Rule 1.5(a) of the Rules of Professional Conduct.

**{¶106}** We find that the trial court did not abuse its discretion in its award of attorneys' fees.

**{¶107}** Appellant argues that the court did not take into consideration the fee customarily charged in the locality for similar legal services. However, as noted by appellees, the combined hourly rate of $247.34 was awarded by the trial court - ($307,250 divided by 2242.20 billable hours). Appellant noted during oral argument that the Probate Judge in Stark County customarily allowed a rate not to exceed $300 per hour. Accordingly, appellant has not demonstrated that the appellee siblings were awarded attorneys' fees out of line with the customary rate.

**{¶108}** So, too, appellant argues that appellees' counsel should not be awarded attorneys' fees for the appeal work done in *Daddario I* in which appellant prevailed on one assignment of error and the case was remanded to the trial court. However, as noted by appellees, appellant did not prevail on the remainder of the assignments of error. Appellant also filed a second appeal that was dismissed by this Court for lack of jurisdiction in which appellees-siblings filed various pleadings.

**{¶109}** This Court has also found an award of attorneys' fees for work performed on prior appeals to this Court is permissible when awarded pursuant to a remedial statute such as R.C.5810.04. *McHenry v. McHenry,* 2017-Ohio-134 (5th Dist.) at ¶ 65.

**{¶110}** In short, the award of attorneys' fees does not shock the conscience and is reasonable under the Rules of Professional Conduct. Appellees-siblings were awarded close to one million in damages over litigation which lasted over three years.

{¶111} The trial court did not abuse its discretion in its award of attorneys' fees.

{¶112} The second assignment of error is overruled.

### III. *Testimony of Attorney Brown*

{¶113} In her last assignment of error, appellant argues that the trial court erred by permitting expert testimony on attorneys' fees in violation of Civ.R. 26(B)(7). Civ.R. 26(B)(7) requires that reports of expert witnesses shall be exchanged with all other parties and expert report and curriculum vitae must be exchanged in accordance with the time schedule established by the court.

{¶114} In this case, Attorney Charles Brown testified at the evidentiary hearing on attorneys' fees on behalf of appellees.

{¶115} The evidentiary hearing on attorneys' fees was held on August 25, 2023. Prior to the hearing, a pre-hearing conference was held among the parties and the parties agreed, in a judgment entry, to exchange the names of witnesses at least three days prior to trial. *Agreed Judgment Entry, July 14, 2023.*

{¶116} There is no claim by appellant that appellees did not comply with this judgment entry and identify Attorney Brown as a witness. Instead, appellant complains that Charles Brown was called as an expert witness on the issue of attorneys' fees and allowed to testify that appellees' attorney fees were reasonable and other matters related to the skill and invoices of the appellees' attorneys.

{¶117} Appellant objected at the hearing, the trial court overruled the objection, and Attorney Brown testified and was available for cross examination by appellant.

{¶118} The trial court treated Attorney Brown as a lay witness and stated during the hearing: "Well, we don't have an expert witness. We've already clarified that."

**{¶119}** Appellant has provided no citation to authority that Civ.R.26(B)(7) applies to this case. The parties entered into an agreed judgment entry that set forth the rules regarding the naming of witnesses. Appellant does not allege that she did not receive the name of Attorney Brown prior to the hearing.

**{¶120}** Still, there is nothing in the record that demonstrates that the trial court relied on Attorney Brown's testimony in its decision awarding attorneys' fees.

**{¶121}** The trial court made it clear to the parties during the hearing what he was considering in his award of attorneys' fees:

> [COURT]: So I can look at the itemized statement and reach a decision because, I might have said this before, I believe I have, that all of my decisions are based on Rules of Professional Conduct 1.5(A) and the eight conditions there that I would be looking at and that's what I look at. Tr. August 24, 2023 at 44-45.

**{¶122}** Even then, in its judgment entry, the trial court stated the evidence it relied upon to award attorneys' fees:

> During the hearing held in this matter, the Plaintiffs provided evidence by way of testimony from their legal counsel, in addition to submitting their invoices for work performed, including case expenses that were incurred by the Plaintiff. In considering that evidence, the Court must determine whether the fees to be assessed against the Defendant are reasonable. *Judgment Entry, Jan. 8, 2024 at 5.*

**{¶123}** In short, appellant has failed to cite to any authority that Civ.R. 26(B)(7) applies in this case, where the parties agreed in a judgment entry on the manner in which

the parties would name witnesses and have prior knowledge of witnesses. Appellant has failed to demonstrate that the testimony of Attorney Brown in some way affected the outcome of the hearing. The trial court stated in its judgment entry and at the hearing what it considered in making its determination. The trial court closely examined the invoices and testimony of the appellees' legal counsel. The trial court did not award appellees the attorneys' fees they requested instead reducing the request by one-third and less than $300 per hour.

**{¶124}** The third assignment of error is overruled.

## CONCLUSION

**{¶125}** For the foregoing reasons, the judgment of the Court of Common Pleas, Probate Division, Stark County, Ohio, is affirmed.

By: Wise, J.

Gwin, P. J., and

King, J., concur.

JWW/kt 1209